S. P. McCall v. Commissioner. Dorothy Wallace v. Commissioner.
McCall v. Commissioner
Docket Nos. 25895, 25896.
United States Tax Court
T.C. Memo 1954-33; 1954 Tax Ct. Memo LEXIS 215; 13 T.C.M. (CCH) 446; T.C.M. (RIA) 54138; May 10, 1954, Filed *215 Edward L. Potter, Esq., for the petitioner in Docket No. 25895. Marvin K. Collie, Esq., and W. B. Langworthy, Esq., for the petitioner in Docket No. 25896. Joseph P. Crowe, Esq., for the respondent. JOHNSON
Memorandum Findings of Fact and Opinion JOHNSON, Judge: Respondent determined deficiencies in income tax and penalties as follows: 5%
5%
Delinquency
Negligence
Docket No.
Petitioner
Year
Deficiency
Penalty
Penalty
25895
S. P. McCall
1943
$36,293.01
$1,548.11
$3,362.76
1944
5,909.90
1945
6,613.62
25896
Dorothy Wallace
1943
36,293.01
1,548.11
3,362.76
1944
5,909.90
1945
6,613.62
On October 21, 1953, a Memorandum Findings of Fact and Opinion was entered in these proceedings. On motion of the petitioners, filed with this Court on November 20, 1953, the Memorandum Findings of Fact and Opinion was ordered withdrawn for the purpose of receiving evidence pertaining to the estimated useful life of petitioners' equipment. At a hearing held on April 8, 1954, the parties submitted a supplemental stipulation of facts pertaining to all items in dispute on this issue. Even though *216 some of the adjustments to petitioners' net income are not in dispute, the following issues are presented for our consideration: (1) What was the rental income and the depreciation deduction for the Lima Dragline No. 703 in 1942 and 1943? (2) Were gains realized by petitioners during 1942 through 1945 from the sale of machinery and equipment ordinary or capital gains? If the gains are capital gains, are the rentals received by petitioners under lease agreements in which the recapture provisions were exercised ordinary income or part of the purchase price? (3) Were petitioners entitled to business deductions for the maintenance of a boat and a deer camp? (4) Were petitioners entitled to certain bad debt deductions? (5) Were petitioners entitled to certain depreciation deductions for the Carlon Courts? (6) Was any part of the deficiencies in 1942 and 1943 due to petitioners' negligence or intentional disregard for the rules and regulations? Findings of Fact General During the years 1942 through 1945 S. P. McCall was married to Dorothy McCall. They were divorced subsequent to 1945 and she is now Mrs. Dorothy Wallace. They filed separate income tax returns on an accrual *217 and community property basis for che years 1942 through 1945 with the collector of internal revenue for the first district of Texas. S. P. McCall will be referred to hereinafter as the petitioner. For the years before us petitioner was engaged in leasing and selling various types of construction machinery and equipment such as tractors, draglines, air compressors, water pumps and air hammers used by contractors in moving earth and in constructing highways, streets and bridges. During the years 1944 and 1945 petitioner also engaged in hauling oil field equipment. Issue 1. Depreciation and Rental Income for Lima Dragline No. 703 Findings of Fact. - Lima Dragline No. 703, a used machine, was purchased by petitioner from L. A. Stewart in December 1941. However, Stewart was adjudged bankrupt in 1942 and title to the dragline was involved in the bankruptcy proceedings. On November 30, 1943, the bankruptcy court relinquished any claim to the property. Petitioner's title to the dragline was not clear and unencumbered during 1942 and he did not have a claim of right in 1942 to the rental income accrued in that year from the lease of the machine. Rent which accrued from the operation *218 of the dragline in 1942 in the amount of $10,219.79 was paid in 1944. This sum was includible in petitioner's income in 1943. Petitioner paid $10,258 for the dragline and at the time of purchase it had an economic useful life under normal operating conditions of seven years. Opinion. - The first "issue" really involves two questions, one concerning depreciation and another the accrual of the rental income, both in connection with Lima Dragline No. 703. Petitioner contends first that the depreciation deduction for the 1942-1943 period is half of his cost basis and that it was deductible in 1943. Petitioner suggests that a reasonable amount for depreciation on the dragline is $5,129 for the period 1942-1943. Second, he also contends that the rental income for the use of the dragline during 1942 and 1943 accrued in 1943. Respondent, on the other hand, contends that part of the rental was income to the petitioner in 1942 and taxable in that year. Respondent makes no specific contention concerning the depreciation deduction. There is testimony that petitioner's equipment was given abnormal use during 1942 and 1943. But we do not have sufficient evidence to conclude that respondent *219 erred in his determination of the estimated useful life of this dragline. Therefore, the respondent must be sustained as to the total amount of the depreciation to which petitioner is entitled on account of this dragline. With regard to petitioner's contention that a deduction for the depreciation sustained in the two years, 1942 and 1943, may be taken in 1943, when the right to the rental income from the dragline became validated, the short answer is that the deduction must be taken in the year wear and tear occurred. Under the rule established in Virginian Hotel Corporation of Lynchburg v. Helvering. 319 U.S. 523, a depreciation deduction must be taken in the year it occurs and it can not be accumulated to be used in a year of high income. Petitioner acquired the dragline in December 1941, but because of a bankruptcy proceeding petitioner's right to the title was not clear until 1943. Until clear title vested in petitioner he had no claim of right to the rental income from the use of the dragline. His claim of right to the rental income was validated in 1943. Since he is on an accrual basis, and the amount was fixed, the rental income of 1942 and 1943 became taxable *220 in 1943. As the Court said in Spring City Foundry Co. v. Commissioner, 292 U.S. 182, "it is the right to receive and not the actual receipt that determines the inclusion of the amount in gross income." Issue 2. Sale of Equipment - Ordinary or Capital Gain Findings of Fact. - Petitioner was in the business of selling and leasing heavy equipment and machinery in the years 1942 through 1945. Some of his rental agreements contained an option whereby the lessee might purchase the equipment at a stipulated price. Other rental agreements contained a recapture provision. In the returns for the years 1942 through 1945 petitioner reported income from sales of equipment, equipment rentals and sales on lease contracts. In 1943, 1944 and 1945 he also reported a net capital gain from the sales of equipment. Petitioner's sales of rental equipment which was held for more than six months were as follows: Aggregate
Aggregate Cost
Sales Price
Year
or Other Basis
or Collections
1942
$13,667.26
$34,596.73
1943
28,929.31
42,154.10
1944
24,339.89
69,254.83
1945
23,667.09
63,858.95
In 1945 petitioner sold two pieces of rental equipment for an aggregate *221 sales price or $3,652.60. This equipment cost $3,173.67 and was held for less than six months. For the rental equipment under lease contracts which was later sold, petitioner's lessees made payments large enough to give them an equity in the equipment. In 1942 petitioner sold certain equipment with a cost or other basis of $12,662.26; in this year and for this equipment, he received payment under his lease contracts in the amount of $32,096.73. From the many schedules presented in evidence comparable figures can be obtained for 1943, 1944 and 1945. However, because the parties are in agreement as to the items sold, their cost, and the amounts received under the lease agreements, petitioner's tax liability can be computed under Rule 50, once we have determined whether the amounts collected under the lease agreements are payments of purchase price or rent for the use of property. Opinion. - The first question before us in this second issue is whether petitioner was in the business of renting heavy equipment. Respondent urges us to find that petitioner was only in the business of selling equipment. However, even if we were to believe only a small part of the great quantity of testimony *222 presented, we must find that the petitioner's business was not limited to the sale of heavy equipment. A great part of the evidence proves the fact that petitioner not only sold heavy equipment but also had an extensive rental business. It is our holding that the gains from the sales of rental equipment in 1942 through 1945 are entitled to the capital gains treatment under section 117(j), I.R.C.[1] See A. Benetti Novelty Co., 13 T.C. 1072; Latimer-Looney Chevrolet, Inc., 19 T.C. 120; cf. Neils Schultz, 44 B.T.A. 146. In making this holding we have considered whether the rental equipment was properly includible in petitioner's inventory, or whether the rental equipment was primarily held for resale to customers in the ordinary course of his business. And we have concluded there is no cause for denying the benefits of section 117(j) to petitioner's gain from the sale of rental equipment.
*223 Since we have determined that petitioner is entitled to the benefits of section 117(j) we must also determine whether rental payments, for equipment which was later sold, are ordinary income or part of the purchase price. In Chicago Stoker Corporation, 14 T.C. 441, we discussed payments which had dual potentialities, that is, they could be payments of purchase price or rent for the use of property. We said: "* * * If payments are large enough to exceed the depreciation and value of the property and thus give the payor an equity in the property, it is less of a distortion of income to regard the payments as purchase price and allow depreciation on the property than to offset the entire payment against the income of one year. That is the rule laid down in the Judson case [Judson Mills, 11 T.C. 25] * * *" We have examined schedules of the payments received by petitioner on the rental equipment, which was later sold. For each of the items sold, the payments were large enough to give the payor an equity in the property. Under the rule established in Chicago Stoker Corporation, supra, the payments received on this rental equipment are held *224 to be payments of purchase price. See Truman Bowen, 12 T.C. 446. Issue 3. Entertainment Expenses Findings of Fact. - During the years 1943, 1944 and 1945 petitioner maintained a small boat and rented a deer camp for the purpose of entertaining customers. Entertaining customers was a common practice of petitioner and his competitors, and the amount spent by petitioner in such entertainment constituted ordinary and necessary business expenses. For each of the years 1943, 1944 and 1945 petitioner is entitled to a business deduction of $300 for the maintenance of his boat and $200 for the maintenance of the deer camp. Opinion. - Petitioner on his 1943, 1944 and 1945 income tax returns reported certain expenditures for his boat and deer camp maintenance, and he claimed these items as proper business deductions. Respondent disallowed them and petitioned his alleged error in respondent's determination. There can be no question that petitioner maintained a boat and a deer camp for the entertainment of his customers. Likewise, expenditures of this sort can be ordinary and necessary business expenses. But the burden is upon the petitioner to prove the expenditures claimed. *225 Petitioner has proved that he did maintain a boat and a deer camp for business purposes, but his proof as to the amounts spent in the maintenance of these activities does not support his claimed expenditures. We have no way of knowing the number of customers entertained, the number of trips taken, the extent of his personal use of these facilities, or the amounts spent per trip, day or week. It is for this reason that we have borne heavily against petitioner in our finding as to the amount allowed as ordinary and necessary business deductions for these expenditures. Issue 4. Bad Debt Deductions Findings of Fact. - In 1941 petitioner wrote off and claimed deductions for specific bad debts amounting to $7,754.30. An account entitled "Bad Debt Reserve" was set up on his books and an amount of $7,754.30 was credited to this account. This credit to the bad debt reserve account was the off-set entry for the claimed specific bad debts. In 1942 petitioner claimed a bad debt deduction of $27,241.79. This sum, exclusive of $1,464.60, represented bad debts but did not include any bad debts which had been written off in 1941. Respondent adjusted petitioner's net income by disallowing part *226 of the bad debt deduction; the disallowance amounted to $9,218.90 ($1,464.60 plus $7,754.30). Petitioner does not dispute the disallowance of $1,464.60 of the claimed bad debts. In 1942 petitioner sustained bad debts in the amount of $25,777.19. In 1943 respondent disallowed a deduction for specific bad debts charged off by petitioner in the amount of $3,072.98. Respondent restored this sum to 1943 income with the following explanation: "(b) It is held that you realized taxable miscellaneous income represented by invoice #7104 for $3,072.98 billed to Texas Dragline Service. No evidence that the account is worthless has been submitted." Opinion. - Petitioner's contention as to the year 1942 is that no reserve for bad debts was set up in 1942. He contends that the account entitled "Bad Debt Reserve" was set up as an erroneous bookkeeping entry. Respondent, on the other hand, contends that it was a valid reserve and that 1942 bad debts should be offset against it. Respondent's disallowance of the bad debts amounting to $9,218.90 is made up of the alleged reserve of $7,754.30 and $1,464.60 of the claimed bad debt deductions which are not now in dispute. In general, bad debt deductions *227 may be accounted for in either of two ways. There may be a deduction for specific bad debts, or there may be a deduction of an addition to a reserve for bad debts. Once an election as to the method of accounting for the deduction is made by a taxpayer, he may not change his method without the permission of the Commissioner. Regulations 111, section 29.23(k)-1. The deduction of the addition to the reserve is usually based upon a percentage of the accounts and notes receivable under the theory that each year a certain percentage of the accounts will be bad without knowing in advance which specific accounts will be bad. Under the reserve method, as specific accounts become bad, a charge is made to the reserve account and a credit to the specific account which is determined to be bad. Under this method no deduction is taken as the specific account becomes bad. The deduction or the debit to a bad debt expense account is entered at the time the reserve or the addition to the reserve is credited. The record indicates that petitioner's bad debt reserve account at the beginning of 1942 was an off-set account for specific bad debts charged off in 1941. Actually, no true reserve was set up *228 in 1941 or 1942. In 1941, as petitioner debited the bad debt expense accounts for the specific bad debts, he erroneously credited a bad debt reserve account; a correct entry would have been a credit to the specific account receivable which was bad. For some reason the bad debt reserve account was carried over on the books from 1941 to 1942 but there is no evidence that as it was carried over a true reserve was set up. During 1942 petitioner charged off $27,241.79 ($18,022.89 plus $7,754.30 plus $1,464.60) as specific bad debts. Respondent allowed $18,022.89 of these claimed bad debts but disallowed the $7,754.30 on the basis that this latter sum should be charged off to the bad debt reserve. Since no reserve in fact was set up in 1941 or 1942, an erroneous bookkeeping entry should not preclude petitioner from taking a deduction for legitimate bad debts. Bookkeeping entries are not binding when they are shown to be inaccurate, and the inaccuracy of petitioner's books has been shown here. Since there is no issue as to the worthlessness of the bad debts amounting to $7,754.30 in 1942, petitioner is sustained as to this amount. Respondent is sustained as to the uncontested $1,464.60. *229 In 1943 petitioner claimed a bad debt of $3,072.98. Respondent disallowed the deduction and restored it to 1943 income. Now no question is raised as to the correctness of respondent's adjustment for 1943, but petitioner contends that he is entitled to the deduction in 1945 as a result of an adverse court decision. There is not sufficient evidence concerning the litigation of the court decision upon which petitioner bases his contention and we have no way of determining whether petitioner is entitled to the deduction as alleged. Therefore, respondent's determination on this item is sustained. Issue 5. Depreciation Deductions for Carlon Courts Findings of Fact. - On July 1, 1944, petitioner acquired a motel in Houston, Texas, known as Carlon Courts. Petitioner paid $69,764 for the buildings and $18,900 for the furniture. At the time of petitioner's purchase both the buildings and the furniture were six years old. New furniture and equipment were also purchased during the year at an aggregate cost of $2,314.55. One group of frame buildings had brick veneer on the sides and front. Another group of buildings had brick veneer all around. These buildings had concrete foundations; *230 however, many of the foundations were cracked. The buildings were cheaply constructed and the reasonable life expectancy of the buildings was 20 years from the date of petitioner's purchase. Petitioner used maple and metal furniture in the rooms occupied by the tourists. The used furniture, which was in the motel at the time of petitioner's purchase, had a reasonable life expectancy of five years. New furniture, which was purchased by petitioner and used in the motel, had a reasonable life expectancy of ten years. Opinion. - Respondent made certain adjustments to petitioner's claimed deductions for the Carlon Courts. From the evidence we have found the reasonable life expectancy of the buildings and furniture and the depreciation deduction should be based on our findings. In petitioner's request for findings of fact, he requested that we find the estimated remaining life for the following items: electric fan and refrigerator, four Model 2418 utility fans and "Model 89 Skill Saw." There is not sufficient evidence in the record for us to make findings of fact as to these items, therefore the respondent's determination as to their depreciation must be sustained. Issue 6. Negligence *231 Penalties Findings of Fact. - Petitioner employed a bookkeeper to keep his records in 1942 and 1943. Whenever government reports or income tax returns were required, petitioner, in addition, employed a firm of certified public accountants to prepare the reports and returns. The accountants did not make an audit of petitioner's books but only took the records as they were presented to them. The accountant who actually prepared petitioner's reports and returns in 1942 and 1943 became a certified public accountant in 1949. Petitioner's accountant and a revenue agent together, in 1946, checked petitioner's books and tax returns from 1942 through 1945. Petitioner's accountant prepared certain schedules as a result of their work and these schedules were submitted in evidence at the hearing. At the time of the hearing some of the original records were missing. There remained, however, a general ledger for 1944 and 1945, check registers for 1942, 1944 and 1945, and a cash receipt book for 1944 and 1945. Petitioner did not know specifically what became of the missing records, although he knew that some of the records were destroyed by a fire. Respondent in his deficiency notice explained *232 the adjustments for the negligence penalties as follows: "The understatement of tax for the years ended December 31, 1942, and December 31, 1943, is due to negligence and under the provisions of section 293(a) of the Internal Revenue Code a penalty of 5% attaches." Respondent made eight adjustments to petitioner's net income in 1942 including one deduction, and in 1943 there were ten adjustments including three deductions. Opinion. - It appears that petitioner did keep adequate books during the taxable years. There were some inaccuracies in his records but we can not say that these were due to negligence of the petitioner or an intentional disregard of the Commissioner's rules and regulations. Accordingly, we reverse respondent's determination as to negligence penalties under section 293(a). Decisions will be entered under Rule 50. Footnotes
1. SEC. 117. CAPITAL GAINS AND LOSSES. * * *
(j) Gains and Losses from Involuntary Conversion and From the Sale or Exchange of Certain Property Used in the Trade or Business. - (1) Definition of Property Used in the Trade or Business. - For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(l), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. * * *↩